**LITE DEPALMA GREENBERG, LLC**
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, New Jersey  07102
Telephone:  (973) 623-3000
Facsimile:  (973) 623-0858
E-mail:  bgreenberg@litedepalma.com

**THE PAYNTER LAW FIRM PLLC**
Stuart M. Paynter (*pro hac vice*)
1200 G Street N.W., Suite 800
Washington, D.C. 20005
Telephone:  (202) 626-4486
Facsimile:  (866) 734-0622
stuart@paynterlawfirm.com

*Attorneys for Plaintiff*

[Additional counsel listed on signature page]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| TRU-FORM OPTICS, INC., on Behalf of Itself and All Others Similarly Situated, | Civil Action No. 15-8824 (MAS)(DEA) |
| *Plaintiff,* | <u>CLASS ACTION</u> |
| v. | **AMENDED CLASS ACTION COMPLAINT** |
| VALEANT PHARMACEUTICALS INTERNATIONAL INC., a British Columbia Corporation, | |
| *Defendant.* | **JURY TRIAL DEMANDED** |

Plaintiff, by and through its attorneys, based on its individual experiences, the

investigation of counsel, and information and belief allege as follows:

**I.     INTRODUCTION**

1.     Defendant Valeant Pharmaceuticals ("Valeant") is widely known for its

controversial business practices.  Among these is Valeant's practice of acquiring rights to

existing healthcare treatments and then implementing outsized price increases, unrelated to any increase in the costs of providing the treatment, in order to boost the company's profits. Coupled with other "aggressive" business practices—including minimizing research and development expenses (the company spends a fraction of what many other big drug companies spend on developing new treatments)—Valeant's profits-through-price-gouging model has been described as "gamesmanship" designed to increase its stock value.

2.      Valeant's practices have been called "deeply immoral," but in some cases, its practices cross the line from immoral to illegal. This case involves such a practice: an anticompetitive scheme by Valeant to monopolize the market for gas permeable contact lens materials and then abuse that monopoly power by raising prices beyond prior competitive levels.

3.      In August 2013, Valeant entered the market for gas permeable ("GP"), or rigid, contact lens materials by acquiring B&L Holdings ("Bausch & Lomb") for $8.7 billion. Bausch & Lomb was the second largest manufacturer of GP "buttons"—the materials used to make GP lenses.

4.      Less than two years after it acquired Bausch & Lomb, in May 2015, Valeant successfully acquired its largest competitor in the GP button market—Paragon Vision Sciences ("Paragon").

5.      Valeant's acquisition of Paragon ("Paragon Acquisition") gave it control of approximately 70% of the overall market for GP buttons, with even greater control over the submarket for the larger buttons used to make "scleral" lenses (approximately 70-80%), and a 100% monopoly over the submarket for Orthokeratology ("OrthoK") buttons.

6.      In a textbook example of the abuse of a monopoly and the anticompetitive effects of consolidated market power, Valeant promptly used its newly acquired market power to raise prices on all its GP materials.

7.      Valeant's anticompetitive conduct resulted in the reduction of competition in the market for GP buttons—and an elimination of competition in the submarket for OrthoK buttons—leaving patients paying higher prices for fewer options.

8.      Upon investigating the Paragon Acquisition and Valeant's subsequent conduct, the FTC found that "[t]he acquisition likely caused significant competitive harm in the relevant markets."  FTC Analysis of Agreement Containing Consent Order to Aid Public Comment, 81 Fed. Reg. 80056 (Nov. 15, 2016) ("FTC Analysis") at 80057.  The FTC entered into a Consent Order with Valeant requiring it to divest itself of Paragon in order to "remedy the concerns raised by the acquisition and restore competition in the relevant markets."  *Id*. at 80058.

9.      The FTC's Order came too late, however, for purchasers of GP buttons such as Plaintiff TruForm Optics, who had already suffered damages as a result of Valeant's anticompetitive conduct.

## II.      PARTIES

10.     Plaintiff Tru-Form Optics, Inc. ("TruForm Optics") is a Texas corporation that manufactures gas permeable contact lenses.  Jan Svochak, the President of Plaintiff TruForm Optics, also served from September 2014 until January 2017 as the Vice President of the gas permeable lens industry's trade association, the Contact Lens Manufacturing Association ("CLMA"), in which approximately 95% of GP finishing labs are members.

11.     Defendant Valeant Pharmaceuticals is a multi-billion dollar pharmaceutical company registered under the laws of the Province of British Columbia with international

3

headquarters in Laval, Quebec.  Its U.S. Headquarters are located in Bridgewater, New Jersey. Around the time of the conduct at issue in this complaint, Valeant also received media attention for its aggressive price increases after the acquisition of two older heart drugs, and is well-known for its aggressive business practices that often skirt, and sometimes overstep, the bounds of legal conduct.  According to public reports, Valeant has received subpoenas related to a criminal investigation into payments between Valeant subsidiaries and medical professionals in violation of federal law.

### III.     JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), as this action arises under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Sections 4, 7 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 18, and 26.  The Court has supplemental subject matter jurisdiction of the pendant state law claims under 28 U.S.C. § 1367.  The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because the amount in controversy for the Class exceeds $5,000,000, and there are members of the Class who are citizens of a different state than the Defendant.  The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff is a citizen of a different state than Defendant.

13.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) and Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, because Defendant resides, transacts business or is found within this District, and a substantial part of the events giving rise to the claims arose in this District.

## IV.    RELEVANT MARKET

14.    The relevant market in this action is the market for the materials used to manufacture rigid gas permeable ("GP") lenses ("GP buttons").

### A.    GAS PERMEABLE LENSES

15.    GP lenses are a type of contact lens made from a firm, durable plastic.  Although these lenses are called "rigid" gas permeable lenses, they differ from the original "hard lens" contacts in that they allow oxygen to pass through the lens and reach the cornea.  GP lenses are custom made for each individual, requiring an eye care practitioner ("ECP")[1] to measure the exact shape of the cornea—often using sophisticated techniques to map eye topography—and prescribe lenses with the specific curvature, size, and corrective power to suit a particular patient's eyes.

### 1.    Orthokeratology Lenses

16.    Orthokeratology (or "OrthoK") refers to the use of GP lenses worn while the patient is sleeping, in order to slowly reshape the cornea and correct vision.[2] The reshaping effects of OrthoK lenses, while not permanent, last long enough that a patient's vision remains corrected throughout the following day—without the need to wear daytime contacts or glasses.

17.    OrthoK lenses are the only non-surgical treatment for myopia that permits a patient to be free from contacts or glasses during daytime hours.  OrthoK lenses may also be used to slow the progression of myopia in children and teenagers, which cannot be accomplished with glasses or other types of contact lenses.

---

[1] ECPs can include ophthalmologists, optometrists, and opticians.

[2] Although OrthoK lenses can also sometimes be worn during the day, there are differences in the materials that can be used in such "daywear" lenses as opposed to overnight lenses; for purposes of this complaint, "OrthoK" will refer only to *overnight* OrthoK products.

## 2.    Scleral Lenses

18.    Scleral lenses are large-diameter GP lenses.  They are made of the same materials as normal GP lenses, but while conventional GP lenses are designed to cover only a portion of the cornea (the clear layer of the eye that covers the pupil and iris), scleral lenses cover the entire corneal surface and rest on the sclera (the "white" of the eye).

19.    The market for scleral lenses is approximately 20% of the overall market for GP lenses, and is the fastest-growing segment of the greater GP lens market.

20.    Approximately two-thirds of patients who use scleral lenses—and approximately 25% of the GP market in general—suffer from keratoconus, a progressive eye disease in which the cornea thins and takes on a cone-like shape, causing distorted vision.  Such patients do not generally have a non-glasses alternative to GP lenses, since the rigidity of GP lenses is critical to the creation of the "tear layer" between the lens and the cornea that is essential to correcting distorted vision due to keratoconus.

## B.    MANUFACTURING PROCESS FOR GP LENSES

21.    The manufacturing process for GP lenses begins with the manufacture of a material approved by the Food and Drug Administration ("FDA"),[3] usually made of oxygen-permeable plastic polymers containing silicone and fluorine ("GP material").  The GP material is then made into small disks (called "buttons"), which are individually mounted on spinning shafts and shaped with computer-controlled precision cutting tools.

---

[3] Materials used to make lenses for end users in other countries must be approved by regulatory agencies in those countries.  In most countries, the materials used to manufacture the lenses must either have the same FDA approvals required for sale of the lenses in the U.S., or must have similar approvals by the governments of the countries in which they are sold—approvals which often take even longer to acquire than FDA approval.

22.     For the vast majority of GP lenses sold in the United States, the process of shaping the buttons into lenses is performed by independent finishing labs,[4] such as Plaintiff TruForm Optics, which specialize in the custom manufacture of gas permeable contact lenses ("Labs").

23.     The Labs purchase GP buttons from a materials manufacturer, then custom shape each lens using a particular lens design in conjunction with the patient's specific prescription information as communicated by the ECP.  Many Labs have their own unique GP lens designs—some patented, and others protected as trade secrets.  The Labs compete with each other for customers through the creation of these designs,[5] as well as by cultivating contacts with ECPs, and by generally marketing their specialized services to ECPs and their patients.

C.     **COMPETITIVE LANDSCAPE FOR GP BUTTON MANUFACTURERS**

24.     At the time of the Paragon Acquisition, the field of competition for manufacturers of GP buttons was small, with only approximately 10 companies manufacturing GP buttons for sale in the United States, and even fewer of those manufacturing more "modern" materials with greater levels of oxygen permeability ("DK")—which are in higher demand than lower-DK materials.  Bausch & Lomb and Paragon dominated the market, accounting for approximately 65-75% of the GP buttons sold.

25.     The competitive field was even smaller for manufacturers of scleral and OrthoK buttons, with only approximately four companies manufacturing large-diameter buttons for use in scleral lenses.

---

[4] "Independent" refers to the fact that the Labs generally only manufacture finished lenses, independent of the manufacture of the GP material.

[5] Although many Labs have their own unique designs, many Labs also use designs licensed from other design owners.

26.     For OrthoK specifically, before May 2015, there were only two competitors in the market for the manufacture of FDA-approved OrthoK buttons: Paragon and Bausch & Lomb (owned by Valeant as of 2013).  After purchasing Paragon in May 2015, Valeant controlled 100% of the market for those buttons.  In addition to monopolizing the market for OrthoK buttons, Valeant also controlled the other half of the market for OrthoK lenses, which is composed of a single OrthoK product called the Paragon CRT.[6] The Paragon CRT is a "finished" lens product manufactured by Paragon, meaning that both the manufacture of the buttons and the shaping of the buttons into lenses are performed by Paragon, which then sells the lenses directly to ECPs and their patients.  Valeant's Paragon CRT product thus competed directly with the OrthoK lenses manufactured by the Labs to which Valeant provided OrthoK buttons.

27.     The costs of entering the GP button market—or expanding any existing manufacturing capability—create a significant barrier to entry into the market.

28.     Given the already-limited competitive landscape in the market for GP buttons, Valeant's acquisition of Paragon caused significant harm to the competitiveness of that market. As the FTC found, the acquisition of Paragon "eliminated actual, direct, and substantial competition between Valeant and Paragon in the relevant markets for GP buttons and allowed Valeant to unilaterally exercise market power," in addition to "eliminat[ing] innovation competition" between the two companies, which no longer had the incentive to improve and develop new GP materials.  FTC Analysis at 80057.

---

[6] CRT stands for "corneal refractive therapy." Although CRT lenses technically use different technology, the term "orthokeratology" (or OrthoK) is usually used to describe to describe all types of corneal reshaping lenses, including the Paragon CRT.  *See, e.g.,* http://www.allaboutvision.com/contacts/orthok.htm.  For that reason, this Complaint uses the term "OrthoK" to mean all lenses used for orthokeratology, including CRT lenses.

29.     Valeant's anticompetitive dominance of the market for GP buttons was explained in part by the burdensome process of gaining approval from the FDA for GP lenses, which requires enormous outlays of both time and money, creating a significant barrier to entry into the GP button market.

30.     GP lenses are considered "medical devices" by the FDA and must be approved prior to being marketed or sold in the United States.  This entails an application to the FDA, and a showing that both the material out of which a lens is made, and the lens design itself, are safe for their intended use.

31.     GP lenses fall into either the "Class II" or "Class III" medical device categories, both of which require extensive investments of time and money in order to be approved or cleared by the FDA.

32.     Class III devices, which include OrthoK and other "extended-wear" GP lenses, require manufacturers to go through the burdensome premarket approval ("PMA") process, which entails getting approval for both the materials from which it a lens is made, and the specific design of the lens.  According to the FDA:

> PMA is the most stringent type of device marketing application required by the FDA.  The applicant must receive FDA approval of its PMA application prior to marketing the device.  PMA approval is based on a determination by FDA that the PMA contains sufficient valid scientific evidence to assure that the device is safe and effective for its intended use(s).  An approved PMA is, in effect, a private license granting the applicant (or owner) permission to market the device.[7]

33.     The process to get PMA approval from the FDA takes several years, and requires an applicant to conduct clinical and/or non-clinical studies and provide the FDA with "scientific,

---

[7] *See* http://www.fda.gov/Medicaldevices/Deviceregulationandguidance/Howtomarket yourdevice/Premarketsubmissions/Premarketapprovalpma/Default.Htm ("FDA Website on PMA").

regulatory documentation . . . to demonstrate the safety and effectiveness of the class III device."[8]  The process can cost over $1,000,000, with just the initial application fee costing approximately $60,000 to $250,000, depending on whether or not an applicant is considered a "small business."

34.     As the FDA puts it, "[a]n approved PMA is, in effect, a private license granting the applicant (or owner) permission to market the device.  The PMA owner, however, can authorize use of its data by another."[9]  In practice, in the GP lens industry, holders of PMAs have historically been the manufacturers of the materials, who undergo the rigorous PMA process to get their materials approved, and, as a part of that approval, also get approval for a specific GP lens design.

35.     Because the design approvals are relatively broad, however, the Labs can still create and market unique lens designs—but they can do so only if they operate as "alternate manufacturing sites" under the umbrella of FDA approvals held by the manufacturer of the GP material.  In practice, this means that Labs cannot get approval for their Class III lens designs independently, but must operate as "design partners" with the button manufacturers.

---

[8] Such studies take a substantial amount of time to complete, and even once a submission is made to the FDA, the application must undergo a lengthy review process; as the FDA itself acknowledges, although "FDA regulations provide 180 days to review the PMA and make a determination[, but] [i]n reality, the review time is normally longer."  FDA Website on PMA.  The FTC found that getting approval for a Class III GP lens takes "several years."  FTC Analysis at 80058.

[9] FDA Website on PMA.

36.     After the Paragon Acquisition, this meant that Labs could not get approval for any Class III lens designs without the cooperation of a single company—Valeant.[10]

37.     For Class II devices, which include scleral lenses and other GP lenses intended for general vision correction, FDA approval requires obtaining a "510(k) clearance," which refers to the section of the Food, Drug and Cosmetic Act requiring device manufacturers to notify the FDA of their intent to market a new medical device that is "substantially equivalent" to one that has already been FDA approved.

38.     To obtain a 510(k) clearance, the FDA requires the filing of a 510(k) Premarket Notification, which must be submitted to the FDA at least 90 days in advance of the time a company intends to market a medical device.  The 510(k) Notification must demonstrate "that the device to be marketed is at least as safe and effective, that is, substantially equivalent, to a legally marketed device."[11]  The process requires approximately a year, thousands of dollars, and a substantial investment of time in compiling the submission.

39.     For both Class II and Class III lenses, the existence of a relatively large number Labs (*i.e.*, competitors in the market for finished lenses) has encouraged innovation through competition with respect to lens designs, providing patients with a wider range of choices. However, the competitiveness of that market—and the number of choices available to patients— is significantly affected and constrained by the willingness of the small number of button

---

[10] With respect to OrthoK buttons, there were only three types of GP lens materials approved by the FDA for overnight wear at the time of the Paragon Acquisition.  After the Paragon Acquisition, Valeant controlled 100% of those materials, so that all designs had to fall under the "umbrella" of those PMAs; thus, all OrthoK designs had to be covered under either Bausch & Lomb's approval for its "Vision Shaping Treatment (VST)" design, or Paragon's approval for its "Paragon Quadra" design.

[11] FDA Website, "Premarket Notification 510(k)," *at* https://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/PremarketSubmissions/PremarketNotification510k/default.htm (last accessed 2/28/2017).

manufacturers to permit Labs to operate under their FDA approvals.  Because Bausch & Lomb and Paragon controlled the lion's share of the GP button market—and 100% of the OrthoK market—Labs refused such permission by either of the two companies were at a significant disadvantage in the GP lens market.  This dynamic was exacerbated when Valeant combined the two companies.

40.    Prior to the Paragon Acquisition, Bausch & Lomb and Paragon had competed vigorously on price, as well as by marketing their products to both ECPs and Labs; investing substantial time and capital in the creation and acquisition of new GP materials and in the FDA approval process for those materials; and investing substantial time and capital in the promotion of the GP lens industry in general, both through individual agreements with Labs, as well as through participation in the CLMA.

41.    For example, prior to the Paragon Acquisition, Bausch & Lomb had a long-standing arrangement with many Labs (referred to as the "Boston Contract Pricing Program") in which the Labs received per-button discounts in exchange for sharing detailed information relating to the number of lenses sold using Bausch & Lomb materials, as a percentage of overall sales, in addition to exclusively recommending certain Bausch & Lomb products and conducting additional promotion of Bausch & Lomb brands.  In an effort to compete with Bausch & Lomb, Paragon offered similar programs to discount button prices.  These programs are generally referred to as "Contract Pricing."

42.    In addition, both Bausch & Lomb and Paragon were "associate" members of the CLMA, and together paid over $300,000 in annual dues and sponsorship contributions to various events.  The companies' contributions were especially critical to funding the Gas Permeable Lens Institute, the educational arm of the CLMA, which provides ECPs with educational and

practice-building resources to increase awareness of and utilization of GP lenses, thus promoting the growth of the GP lens industry and benefiting all market participants.

43.    That vigorous competition disappeared once Valeant owned both Bausch & Lomb and Paragon.

## V.    ANTICOMPETITIVE CONDUCT

44.    Less than five months after acquiring Paragon, on September 15, 2015, Valeant used its newly consolidated market power to implement price hikes on its GP buttons, increasing prices overall on GP buttons sold to Labs for domestic use by an average of approximately 27%, with even greater increases on the price of its OrthoK buttons (average increase of approximately 63%).

45.    At the same time, Valeant also eliminated volume discounts for all GP buttons.

46.    In addition, on or around the same date, Valeant increased prices on all GP buttons sold to Labs for use by patients outside the United States.

47.    Upon information and belief, Valeant's price hikes on GP buttons were not only an unlawful abuse of its market power in order to extract profit from customers who have no other options in the marketplace.  In this case, Valeant's intent was to expand quickly into the market for finished lenses, and by increasing the costs of its GP buttons, Valeant intended not only to increase its profit from button sales in the short- and medium-term, but to prevent the Labs from competing with it in the market for finished lenses.[12] In other words, Valeant intended

---

[12] Valeant had a head-start on that expansion with its purchase of Paragon, which manufactured the CRT lens that directly competed with the Labs' finished lenses.  Moreover, because of its historical position as a "partner" of the Labs in marketing GP lenses, Valeant had direct access to contact information for many of the ECPs that had until then been customers of the Labs, but not directly of Valeant.  For example, Valeant had access to contact information for every ECP in the United States certified by the FDA to fit patients with OrthoK lenses, since the certification process required that information to be submitted to Valeant as the material manufacturer.

to use its horizontal control over the market for GP buttons to allow it to achieve vertical control over the entire market for GP lenses.[13]

48.     In the months before implementing the price increases on GP buttons, and in the months after, Valeant also made several offers to purchase Labs which would have allowed it to increase its capacity to produce finished GP lenses.  Upon information and belief, once it had increased that capacity, Valeant intended to use its market power as a materials manufacturer to effectively put the Labs (its customers, and now competitors) out of business—increasing its market share for finished lenses and leaving it free to implement further price increases throughout the supply chain.

49.     Also shortly after the Paragon Acquisition, both Bausch & Lomb and Paragon announced that they would be withdrawing as CLMA members, resulting in a loss of approximately $300,000 in dues and a subsequent crisis with respect to funding of industry-wide educational programs—the continued funding of which was only possible because seventeen CLMA member Labs donated $7,500 each and the CLMA increased dues charged to smaller materials manufacturers by 50%.

50.     Moreover, after the Paragon Acquisition, having surmised Valeant's intent to monopolize the industry, many Labs refused to provide Valeant with information that would be used to help put them out of business.  Thus, as a direct consequence of Valeant's conduct, Labs lost their Contract Pricing discounts.

51.     In addition to the Paragon Acquisition, Valeant purchased, around the same time, Pelican Products, a company that manufactured, upon information and belief, 80–100% of the

---

[13] In the case of OrthoK lenses, this would have resulted in a 100% horizontal and vertical monopoly over the market.  Valeant confirmed its intent to exclude its competitors from the market altogether when, in early December 2015, Valeant began informing Labs that they could no longer purchase Paragon HDS OrthoK buttons.

specialized cases used by the Labs to ship GP lenses to ECPs—an acquisition that further tightened Valeant's grip on the vertical supply chain for GP lenses.[14]

52.    In the end, Valeant's anticompetitive plans were cut short by the FTC, which investigated the company, found that its acquisition of Paragon had "likely caused significant competitive harm in the relevant markets," and entered into a consent order with Valeant requiring the company to divest itself of both Paragon and Pelican Products.  FTC Analysis at 80057.

## VI.    ANTITRUST INJURY TO PLAINTIFF & CLASS MEMBERS

53.    As alleged in detail above, after and due to Valeant's consolidation of market power in the market for GP buttons, competition in the market for GP buttons was restrained, and there were significant price increases for the Labs that are the direct purchasers of those buttons.

54.    In addition, Valeant's conduct caused a reduction of marketing and education funding for the Labs—both directly[15] and by Valeant's subsequent withdrawal from the CLMA, to which Bausch & Lomb and Paragon had formerly contributed approximately $300,000 annually in dues that were used to advocate for the GP lens industry as a whole.

---

[14] Many Labs worked closely with Pelican to develop their specialized cases, and Pelican's extremely high market share for the cases derived from having specifically developed their products so that, unlike, their competitors, their manufacturing process did not leave a residue on the case that could negatively affect the shipped lenses.  The Labs thus could not substitute competitors' cases without incurring additional expense to remove residue before shipping lenses in them.

[15] Prior to the Paragon Acquisition, the competition between Bausch & Lomb and Paragon had caused the companies to offer "cooperative funds" to Labs in order to incentivize Labs to help the button manufacturers market their materials.  After the companies were consolidated, Valeant had sufficient market power that it no longer needed the Labs' cooperation in marketing its materials.  Indeed, many Labs felt that Valeant's conduct was a deep betrayal of the historical business partnerships between Labs and button manufacturers, whereby the Labs' work to market Bausch & Lomb and Paragon materials would now essentially be used by Valeant to bypass the Labs and achieve a complete market monopoly.

55.     As a direct result of Valeant's anticompetitive actions, competition in the market for GP buttons was restrained, and the price increases on those buttons was a result of that constraint.

## VII.    CLASS ACTION ALLEGATIONS

56.     Plaintiff sues on its own behalf and on behalf of a class of persons and entities pursuant to Federal Rule of Civil Procedure 23.  The Class consists of all direct purchasers in the United States of GP buttons manufactured by Valeant or any wholly owned subsidiary of Valeant.

57.     The persons in the Class are so numerous that individual joinder of all members is impracticable under the circumstances of this case.  Although the precise number of such persons is unknown, the exact size of the Class is easily ascertainable, as each class member can by identified by the Defendant's sales records.

58.      There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

(a)     Whether Defendant abused its market power and caused significant competitive harm in the relevant market,

(b)     Whether such harm was outweighed by any efficiencies brought about by Defendant's conduct;

(c)     Whether Defendant had a monopoly in the market, and whether Defendant gained that monopoly unlawfully;

(d)     Whether Defendant's actions in acquiring Paragon violated both federal and state law;

(e)     Whether consumers and class members have been damaged by Defendant's conduct;

(f)     Whether Defendant should disgorge unlawful profits; and

(g)     The nature and scope of injunctive relief necessary to restore a competitive market.

59.     Plaintiff's claims are typical of the Class's claim, as they arise out of the same course of conduct and the same legal theories as the rest of the Class, and Plaintiff challenges the practices and course of conduct engaged in by Defendant with respect to the Class as a whole.

60.     Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff has retained counsel who are able and experienced class action litigators.

61.     Resolution of this action on a class-wide basis is superior to other available methods and is a fair and efficient adjudication of the controversy because in the context of this litigation, no individual class member can justify the commitment of the large financial resources to vigorously prosecute a lawsuit against Defendant.  Separate actions by individual class members would also create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Defendant and substantially impede or impair the ability of class members to pursue their claims.  A class action also makes sense because Defendant has acted and refused to take steps that are, upon information and belief, generally applicable all companies in the marketplace, thereby making injunctive relief appropriate with respect to the Class as a whole.

**VIII.   COMMON COURSE OF CONDUCT EMANATING FROM NEW JERSEY**

62.     Upon information and belief, the unlawful course of conduct outlined above was created, adopted, ratified and/or implemented in the corporate headquarters of Valeant, located in Bridgewater, New Jersey.  Upon information and belief, the Valeant executives responsible for the series of anticompetitive agreements outlined above are based in New Jersey and a substantial part, if not all, the anticompetitive conduct took place in New Jersey.  Therefore, application of New Jersey law to a nationwide class is appropriate.

## IX.    CLAIMS
## FIRST CAUSE OF ACTION,
## VIOLATION OF SECTION 2 OF THE SHERMAN ACT
## (GP BUTTONS)
## (15 U.S.C. § 2)

63.    Each of the foregoing allegations is incorporated in this claim for relief.

64.    The relevant product market is the market for GP buttons.

65.    The relevant geographic market is the entire United States.

66.    During the time that Valeant owned and controlled Paragon, Valeant possessed monopoly power in the market for GP buttons.  Valeant controlled approximately 70% of the market, and no reasonably interchangeable product effectively constrained Valeant from imposing and profitably sustaining a significant non-transitory price increase in the market.

67.    Because the manufacture and sale of GP buttons requires substantial time and effort—including time-intensive and costly FDA approval—substantial barriers to entry and expansion exist in the relevant market.

68.    Valeant willfully obtained, maintained, and enhanced its monopoly in the GP button market, and used that power to raise prices above previously competitive levels. Valeant's actions limited competition in the market for GP buttons and discouraged innovation in the overall market for GP lenses.

69.    There is no legitimate business justification for Valeant's conduct.

70.    As a result of Valeant's conduct, Plaintiff and class members have been injured and will continue to be injured in their businesses and property by higher prices in the GP button market than they would have paid in the absence of Valeant's unlawful acts.

71.    As a result of Valeant's conduct, Plaintiff and class members have been injured and will continue to be injured in their businesses and property by the elimination of discounts from the Contract Pricing Program, which caused them to pay higher prices in the GP button

market than they would have paid in the absence of Valeant's unlawful acts.

72.     Plaintiff and class members have also been injured by the reduction of funds previously available to them for the marketing of their products and education of the public with respect to the GP industry in general.  Such funds previously included those paid directly to Labs in the form of "cooperative" and similar funds, as well as those paid indirectly to the CLMA in the form of dues which were used to benefit class member Labs in the aggregate.  Those funds would have continued to be available but for Valeant's unlawful acts.

73.     Any pro-competitive effects of Valeant's conduct are outweighed by the clear anticompetitive effects.

74.     Plaintiffs and the Class are entitled to damages for their injuries, as well as injunctive relief ensuring that they will not continue to suffer harm from Valeant's unlawful conduct.

## SECOND CAUSE OF ACTION,
## IN THE ALTERNATIVE,
## VIOLATION OF SECTION 2 OF THE SHERMAN ACT
## (ORTHOK BUTTONS)
## (15 U.S.C. § 2)

75.     Plaintiff alleges this claim in the alternative to the First Cause of Action.

76.     Each of the foregoing allegations is incorporated in this claim for relief.

77.     The relevant product market is the market for OrthoK buttons.

78.     The relevant geographic market is the entire United States.

79.     During the time that Valeant owned and controlled Paragon, Valeant possessed monopoly power in the market for OrthoK buttons.  Valeant controlled approximately 100% of the market, and no reasonably interchangeable product effectively constrained Valeant from imposing and profitably sustaining a significant non-transitory price increase in the market.

19

80.     Because the manufacture and sale of OrthoK buttons requires substantial time and effort—including time-intensive and costly FDA approval—substantial barriers to entry and expansion exist in the relevant market.

81.     Valeant willfully obtained, maintained, and enhanced its monopoly in the OrthoK button market, and used that power to raise prices above previously competitive levels. Valeant's actions limited competition in the market for OrthoK buttons and discouraged innovation in the overall market for OrthoK lenses.

82.     There is no legitimate business justification for Valeant's conduct.

83.     As a result of Valeant's conduct, Plaintiff and class members have been injured and will continue to be injured in their businesses and property by higher prices in the OrthoK button market than they would have paid in the absence of Valeant's unlawful acts.

84.     As a result of Valeant's conduct, Plaintiff and class members have been injured and will continue to be injured in their businesses and property by the elimination of discounts from the Contract Pricing Program, which caused them to pay higher prices in the OrthoK button market than they would have paid in the absence of Valeant's unlawful acts.

85.     Plaintiff and class members have also been injured by the reduction of funds previously available to them for the marketing of their products and education of the public with respect to the GP industry in general.  Such funds previously included those paid directly to Labs in the form of "cooperative" and similar funds, as well as those paid indirectly to the CLMA in the form of dues which were used to benefit class member Labs in the aggregate.  Those funds would have continued to be available but for Valeant's unlawful acts.

86.     Any pro-competitive effects of Valeant's conduct are outweighed by the clear anticompetitive effects.

## THIRD CAUSE OF ACTION,
## VIOLATION OF SECTION 7 OF THE CLAYTON ACT
## (15 U.S.C. § 18)

87.     Each of the foregoing allegations is incorporated in this claim for relief.

88.     Valeant and Paragon were engaged at all relevant times in "commerce" as defined in Section 1 of the Clayton Act, 15 U.S.C. § 12.  Valeant's general business practices, its acquisition of Paragon, and the unfair methods of competition alleged herein are acts "in or affecting commerce."

89.     The Paragon Acquisition was an acquisition within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

90.     The relevant product market is the market for GP buttons.

91.     The relevant geographic market is the entire United States.

92.     The Paragon Acquisition substantially lessened competition in the market for GP buttons, in which Valeant and Paragon had previously competed vigorously, and tended to create a monopoly in the market for GP buttons, since the time and effort involved in the manufacture and sale of GP buttons—including time-intensive and costly FDA approvals—create substantial barriers to entry and expansion in that market.

93.     As a result of Valeant's conduct, Plaintiff and class members have been injured and will continue to be injured in their businesses and property by higher prices in the GP button market than they would have paid in the absence of Valeant's unlawful acts.

94.     As a result of Valeant's conduct, Plaintiff and class members have been injured and will continue to be injured in their businesses and property by the elimination of discounts from the Contract Pricing Program, which caused them to pay higher prices in the GP button market than they would have paid in the absence of Valeant's unlawful acts.

95.    Plaintiff and class members have also been injured by the reduction of funds previously available to them for the marketing of their products and education of the public with respect to the GP industry in general.  Such funds previously included those paid directly to Labs in the form of "cooperative" and similar funds, as well as those paid indirectly to the CLMA in the form of dues which were used to benefit class member Labs in the aggregate.  Those funds would have continued to be available but for Valeant's unlawful acts.

96.    Any pro-competitive effects of Valeant's conduct are outweighed by the clear anticompetitive effects.

97.    Plaintiffs and the Class are entitled to damages for their injuries, as well as injunctive relief ensuring that they will not continue to suffer harm from Valeant's unlawful conduct.

**FOURTH CAUSE OF ACTION,**
**VIOLATION OF THE NEW JERSEY ANTITRUST ACT**
**(GP BUTTONS)**
**(N.J.S.A. 56:9-4)**

98.    Each of the foregoing allegations is incorporated in this claim for relief.

99.    The relevant product market is the market for GP buttons.

100.    Valeant transacts business throughout the United States, including New Jersey.

101.    Valeant's unlawful acts were carried out at least in part at its U.S. Headquarters in Bridgewater, New Jersey.

102.    Valeant willfully obtained a monopoly of the market for GP buttons through its acquisition of B&L and Paragon.

103.    As a result of Valeant's conduct, Plaintiff and class members were forced to purchase GP buttons at a price substantially higher than they would have paid in the absence of this unlawful conduct.

104.     Valeant's price increases following its purchase of Paragon demonstrate the success of its attempt to monopolize the market for GP buttons.

**FIFTH CAUSE OF ACTION,
IN THE ALTERNATIVE,
VIOLATION OF THE NEW JERSEY ANTITRUST ACT
(ORTHOK BUTTONS)**

105.     Plaintiff alleges this claim in the alternative to the Fourth Cause of Action.

106.     Each of the foregoing allegations is incorporated in this claim for relief.

107.     The relevant product market is the market for OrthoK buttons.

108.     Valeant transacts business throughout the United States, including New Jersey.

109.     Valeant's unlawful acts were carried out at least in part at its U.S. Headquarters in Bridgeport, New Jersey.

110.      Valeant willfully obtained a monopoly of the market for OrthoK buttons through its acquisition of B&L and Paragon.  This purchase eliminated competition in the market for OrthoK buttons.

111.     As a result of Valeant's conduct, Plaintiff and class members were forced to purchase OrthoK buttons at a price substantially higher than they would have paid in the absence of this unlawful conduct.

112.     Valeant's price increases following its purchase of Paragon demonstrate the success of its attempt to monopolize the market for OrthoK buttons.

**X.     JURY TRIAL DEMANDED**

113.     Plaintiff hereby demands a trial by jury on all issues triable of right by jury.

**PRAYER FOR RELIEF**

114.     WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

(a)     Certification of the action as a Class Action pursuant to the Federal Rules

23

of Civil Procedure, and appointment of Plaintiff as Class Representative and Plaintiff's counsel of record as Class Counsel;

(b)    Actual damages, statutory damages, punitive and/or treble damages, and such other relief as provided by the statutes cited herein;

(c)    Prejudgment and post-judgment interest on such monetary relief;

(d)    Equitable relief in the form of restitution and/or disgorgement of all unlawful or illegal profits received by Defendant as a result of the anticompetitive conduct alleged in herein;

(e)    Appropriate injunctive relief;

(f)    The costs of bringing this suit, including reasonable attorneys' fees; and

(g)    All other relief to which Plaintiffs and members of the Class may be entitled at law or in equity.

Dated: March 1, 2017                      **LITE DEPALMA GREENBERG, LLC**

                                      */s/ Bruce D. Greenberg*

Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, NJ  07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
bgreenberg@litedepalma.com

**THE PAYNTER LAW FIRM PLLC**
Stuart M. Paynter (*pro hac vice*)
1200 G Street N.W., Suite 800
Washington, DC  20005
Telephone: (202) 626-4486
Facsimile: (866) 734-0622
stuart@paynterlawfirm.com

Celeste H.G. Boyd (*pro hac vice*)
106 S. Churton St., Suite 200
Hillsborough, NC 27278
Tel: (919) 307-9991
Fax: (866) 734-0622
cboyd@paynterlawfirm.com

*Attorneys for Plaintiff Tru-Form Optics, Inc.*

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, I hereby certify that the matter in controversy is not related to any other action, pending arbitration or administrative proceeding currently pending in any court.

I hereby certify that the following statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: March 1, 2017

**LITE DEPALMA GREENBERG, LLC**

  */s/ Bruce D. Greenberg*
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, NJ  07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
bgreenberg@litedepalma.com

**THE PAYNTER LAW FIRM PLLC**
Stuart M. Paynter (*pro hac vice*)
1200 G Street N.W., Suite 800
Washington, DC  20005
Telephone: (202) 626-4486
Facsimile: (866) 734-0622
stuart@paynterlawfirm.com

Celeste H.G. Boyd (*pro hac vice*)
106 S. Churton St., Suite 200
Hillsborough, NC 27278
Tel: (919) 307-9991
Fax: (866) 734-0622
cboyd@paynterlawfirm.com

Telephone: (919) 307-9991
Facsimile: (866) 734-0622
cboyd@paynterlawfirm.com

*Attorneys for Plaintiff Tru-Form Optics, Inc.*